## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**APPRIO, INC,**
**425 3rd Street, SW, Suite 600**
**Washington, DC 20024**

     Plaintiff,

     v.

**NEIL ZACCARI,**
**12316 Bradford Landing Way**
**Glen Allen, VA 23059**

     Defendant.

Civil Action No. 1:18-cv-2180

## COMPLAINT

Plaintiff, Apprio, Inc. ("Apprio"), through its counsel, for its complaint against Neil Zaccari ("Zaccari"), alleges as follows:

## INTRODUCTION

This litigation arises because Zaccari, a former employee of Apprio, falsely obtained a copyright registration in his own name for software he claims to have developed while working for Apprio.  This software was never owned by Zaccari, both because it was a work made for hire under the Copyright Act, and also because Zaccari contractually assigned to Apprio all rights in the software.  Worse yet, having obtained the copyright registration under a false claim of ownership, he has sued Apprio, the United States government, and a third party for copyright infringement of the software he does not own.  As set forth herein, all of these activities constitute serious breaches of Zaccari's employment contract with Apprio, and entitle Apprio to a judgment that Zaccari does not own the rights he is attempting to assert.

## THE PARTIES

1.  Plaintiff Apprio, one of the United States' fastest growing private companies, develops

and provides to its customers specialized technology and business solutions, with a focus on health, defense, and homeland security industries.  Much of Apprio's work is performed for the United States government, including the Departments of Defense and Homeland Security. Apprio is a Delaware corporation headquartered in Washington, DC.

2.   On information and belief, Defendant Zaccari, a former employee of Apprio, is a citizen of the Commonwealth of Virginia, residing at 12316 Bradford Landing Way, Glen Allen, VA 23059.

**JURISDICTION AND VENUE**

3.   This is an action for Zaccari's breach of Apprio's Proprietary Information and Assignment of Inventions Agreement (hereinafter "the Agreement") entered into by Zaccari as a condition for his employment and the payment of his salary by Apprio.  This action also seeks a declaratory judgment with respect to the ownership of the software and associated rights over which Zaccari is claiming ownership.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and/or 1338.  The matter in controversy exceeds $75,000, and the plaintiff and defendant are citizens of different states.

4.   This Court possesses personal jurisdiction over Zaccari pursuant to DC Code § 13-423(a)(1), (2), (3), and (4) because Zaccari has purposefully and intentionally availed himself of the privileges of doing business in the District of Columbia.  Zaccari, for instance, and as discussed in more detail below, has entered into contracts in this jurisdiction, including the Agreement in this matter, regularly conducts business in this jurisdiction, has availed himself of the courts of this jurisdiction, for instance by bringing suit against Apprio in this jurisdiction, and has caused Apprio damage in this jurisdiction. As a further basis for this Court possessing personal jurisdiction over Zaccari, Zaccari has consented to this Court's exercise of personal

jurisdiction over him in the Agreement.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).  The Agreement was entered into in the District of Columbia under District of Columbia law. As a further basis for venue being proper in this Court, Zaccari has consented in the Agreement that venue is proper in the District of Columbia for disputes involving the Agreement.

### FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**A.  Apprio's Work for DCMA**

6.    Apprio is a government contractor that regularly performs work for the United States Department of Defense.

7.    Throughout 2014 and earlier, Apprio has contracted to perform work for the U.S. government.  In one such instance, Apprio was hired to perform work for the Defense Contract Management Agency ("DCMA").

8.    DCMA is part of the Department of Defense, which works with government contractors to ensure that government supplies and services are delivered on time, at projected cost, and meet all performance requirements.  DCMA provides contract administration services to support all stages of the government acquisition process.

9.    Apprio was hired to perform various tasks to help DCMA more efficiently receive and review contracts.  This work included advising DCMA with respect to its business processes and the technical tools it used for review.  It also included advising DCMA with respect to the automation, through software applications, of the DCMA contract receipt and review processes, and also developing, testing, and implementing such software.  This work was particularly directed to the development by DCMA of an Integrated Workload Management System ("IWMS") to efficiently receive and review government contracts.

10. One contract pursuant to which Apprio undertook this work was contract no. GS-06F-0925Z (attached hereto as Exhibit A), dated September 1, 2014.  Pursuant to this contract, Apprio was tasked with, among other things, developing, testing, and implementing software for the IWMS and DCMA to allow for more efficient receipt and review of DCMA's contracts.

11. In the second half of 2015, Apprio was awarded another contract by the U.S. government (contract no. S5121A-15-A-0001) (hereinafter the "0001 Contract") (the first Order of which is attached hereto as Exhibit B) to perform additional work for the Defense Contract Management Agency ("DCMA").

12. As part of the 0001 Contract, DCMA contracted with Apprio to continue to help it develop better business practices, in particular with respect to its oversight of government contracts and its development of the IWMS to efficiently receive and review government contracts.  As set forth in the 0001 Contract, part of the work Apprio was hired by DCMA to perform involved the "development of automated tools" to aid in contract review.  A true and accurate copy of the second order under the 0001 Contract is attached as Exhibit C.

13. More specifically, for instance, on September 14, 2015, Apprio was tasked in part as follows: "The contractor shall develop automation tools as increments of Integrated Workload Management System capability."  Ex. C, p. 8.

14. Pursuant to these contracts, Apprio, did create, install, and test prototype software for the automation of DCMA's contract receipt and review processes.  Much of this work occurred prior to Zaccari being hired by Apprio.

15. In addition to the creation, installation and testing of software for the automation of DCMA's contract receipt and review processes, Apprio also performed the following illustrative tasks as part of its obligations under the 0001 Contract:

- IWMS Project Planning & Financial Accounting.
- IWMS Design & Development.
- IWMS Production Support.
- IT EA Support.

**B. Apprio's Hiring of Zaccari**

16. On or about November 2, 2015, Apprio hired Zaccari as a full-time employee. Zaccari's job title was "senior technical manager." Zaccari's salary at Apprio was $150,000 per year, and his employment was at will. A true and correct copy of Zaccari's letter of acceptance with respect to his hiring is attached hereto as Exhibit D.

17. The job description for the position for which Zaccari was hired was as follows:

> Apprio is seeking an experienced Senior Technical Manager who will be able to provide quality customer support to our Customer in Richmond, VA. The Senior Technical Manager will establish[] the program level technical vision and leads all aspects of the program's technology/solution development. This candidate will be an integral team member of the group tech team. Develops technical talent. Internally focused thought leadership. Drives industry best practices.

Accordingly, technology development, and being part of the group technology team, were within the scope of employment for Zaccari's employment as Senior Technical Manager by Apprio.

18. An exemplary list of Zaccari's job responsibilities as a Senior Technical Manager for Apprio were:

- Develops technology strategy that directly supports the efficiencies of the program/work center.
- Key contributor to technical solutions for all qualified pipeline opportunities.
- Develops technical talent by mentoring, pro-active peer reviews and create buy-in for the corporate vision and Best place to Work.
- Keeps abreast of technology within one or more disciplines, the ability to interpret technology trends for the benefit of the program/work center
- Leverage technology team to support "sales" calls and customer meetings.
- Develop white papers and/or thought leadership presentations/articles.

19. At the time Zaccari was hired, Apprio was actively working on developing software to

help automate, and render more efficient, the IWMS and DCMA's contract receipt and review

processes as part of its obligations under the 0001 Contract.  Zaccari was hired to work

particularly with DCMA, helping to advise DCMA with respect to its contract receipt and review

processes and the IWMS and to make its processes more efficient. One of the responsibilities

within the scope of Zaccari's employment was being a "key contributor to technical solutions."

Helping to create and creating technical solutions, such as software that would render more

efficient the IWMS and DCMA's contract receipt and review processes, was fully within the

scope of Zaccari's employment at Apprio.

### C.  The Proprietary Information and Assignment of Inventions Agreement

20. In consideration of his employment with, and salary from, Apprio, Zaccari agreed to be

bound by Apprio's Proprietary Information and Assignment of Inventions Agreement (the

"Agreement").  A true and correct copy of the Agreement to which Zaccari agreed is attached

hereto as Exhibit E.

21. The Agreement is a valid contract, pursuant to which Zaccari undertook a variety of

obligations including the assignment and obligation to assign to Apprio any intellectual property,

including copyrightable material, he created as part of his job responsibilities while working for

Apprio.  The preamble to the Agreement provides, in part: "In consideration of my being

retained as a consultant with or employee of APPRIO, INC., (. . . the Company"), and the

consideration now and hereafter paid to me, I hereby agree as set forth herein."

22. Section 1.1 of the Agreement provides, in part:

> **1.1 Recognition of Company's Rights; Nondisclosure.**  At all times during my
> employment . . . by the Company . . . ("My Service"), and thereafter, I will hold
> in strictest confidence and will not disclose, use, . . . or publish any of the
> Company's Proprietary Information (defined below), except as such disclosure . .
> . may be required in connection with my work for the Company . . . .  I will obtain
> written approval by an authorized officer of the Company before publishing . . .

6

any material . . . that relates to My Service to the Company and/or incorporates any Proprietary Information.  I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns.

23. Section 1.2 of the Agreement provides, in part:

   **1.2 Proprietary Information**.  The term "Proprietary Information" means any and all confidential and/or proprietary knowledge, data or information of the Company.  By way of illustration but not limitation, "Proprietary Information" includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (hereinafter collectively referred to as "Inventions"); and (b) information regarding . . . suppliers and customers . . . .

24. Section 1.3 of the Agreement provides, in part:

   **1.3 Third Party Information**.  I understand, in addition, that the Company has received and in the future will receive from third parties confidential or proprietary information ("Third Party Information") . . . .  During the term of My Service, and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose to anyone . . . or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an authorized officer of the Company in writing.

25. Section 2.2 of the Agreement provides, in part:

   **2.2 Prior Inventions**.  Inventions, if any, patented or unpatented, which I made prior to the commencement of My Service are excluded from the scope of this Agreement . . . .  To preclude any possible uncertainty, I have set forth on a Previous Inventions Disclosure Form . . . provided to the Company's Human Capital Department a complete list of all Inventions that I have . . . conceived . . . prior to the commencement of My Service, and that I both (a) may use in connection with My Service and (b) consider to be my property . . . and that I wish to have excluded from the scope of this Agreement (collectively referred to as "Prior Inventions").  . . . If no such disclosure is made, I represent that there are no Prior Inventions.

Zaccari never disclosed to Apprio, under Section 2.2 of the Agreement, on a Previous Inventions

Disclosure Form or otherwise, any "Prior Inventions" he had created.

26. Section 2.2 of the Agreement also provides, in part:

   If, in the course of My Service, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a

nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense . . . ) to make, have made, modify, use and sell such Prior Invention.

27. Section 2.3 of the Agreement provides, in part:

> **2.3 Assignment of Inventions.**  Subject to Sections 2.4, and 2.6, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first . . . fixed in a tangible medium . . . ) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) . . . made or conceived or reduced to practice or learned by me . . . during the period of My Service.  Inventions assigned to the Company . . . pursuant to this Section 2, are hereinafter referred to as "Company Inventions."

28. Section 1.2 of the Agreement defines "Inventions" as including: trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques. Section 2.1 of the Agreement defines "Proprietary Rights" as including "all trade secret, patent, copyright, mask work and other intellectual property rights throughout the world."

29. Section 2.7 of the Agreement provides:

> **2.7 Works for Hire.**  I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of My Service and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

30. Section 2.8 of the Agreement provides, in part:

> I will assist the Company in every proper way to obtain . . . United States . . . Proprietary Rights relating to Company Inventions . . . .  To that end I will execute, verify and deliver such documents and perform such other acts . . . as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Proprietary Rights and the assignment thereof.  In addition, I will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee. . . . I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company.

31. Section 3.2 of the Agreement provides, in part:

> **3.2 Customers.**  I agree that for the period of My Service and for two (2) years after the Termination Date, I will not directly or indirectly (a) solicit, divert,

appropriate to or accept on behalf of any Competing Business (as defined below), or (b) attempt to solicit, divert, appropriate to or accept on behalf of any Competing Business, any business from any Customer (as defined below). "Competing Business" means a business that . . . sells . . . or otherwise profits from products or services that are in competition with a business activity in which the Company is engaged . . . . "Customer" means any customer . . . with whom I have dealt . . . or about whom I have acquired Proprietary Information or Third Party Information in the course of performing services on behalf of the Company . . . .

32. Section 4 of the Agreement provides, in part:

**4. Records.** I agree to keep and maintain adequate . . . records . . . of all Proprietary Information developed by me and all Inventions made by me during the period of My Service, which records shall be available to and remain the sole property of the Company at all times.

33. Section 5 of the Agreement provides, in part:

**5. Duty of Loyalty During My Service.** I understand that if I am a full-time employee of the Company, my employment with the Company requires my full attention and effort and I agree that during the period of My Service I will not, without the express written consent of an authorized officer of the Company, engage in any employment or business activity other than for the Company . . . .

34. Section 8 of the Agreement provides, in part:

**8. Legal and Equitable Remedies.** I recognize that in the course of My Service, I will have access to Proprietary Information, to Third Party Information, and to . . . customers of the Company. I also recognize that the services I will be employed to provide are personal and unique. I understand that because of this the Company may sustain irreparable injury if I violate this Agreement. In order to limit or prevent such irreparable injury, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief . . . .

**D. Zaccari's Work for Apprio**

35. As part of his responsibilities at Apprio, Zaccari was tasked by Apprio to work with DCMA to, among other things, help it develop the IWMS and render its contract receipt and review processes more efficient.

36. Zaccari spent many months undertaking a review of DCMA's contract receipt and review

9

processes, including its development of the IWMS.  In the course of this review, Zaccari was

provided with proprietary, non-public information about DCMA's contract receipt and review

processes.

37. As a direct result of the work Zaccari was undertaking for Apprio in reviewing DCMA's

processes, and using the non-public information he had obtained from his review of these

processes, Zaccari informed Apprio that he could use the existing capabilities of Microsoft

Excel™ to store a routine (*i.e.*, an Excel macro) – that could help automate and render more

efficient DCMA's contract receipt and review processes.

38. Apprio informed Zaccari that he could proceed to do so and Zaccari, in conjunction with

other employees of Apprio, developed this Excel macro (hereinafter "the CRR Software") within

the scope of his employment for Apprio.  The CRR Software related directly to Zaccari's work

for Apprio, and Apprio's work for DCMA, in advising DCMA on how to improve the IWMS

and render its contract receipt and review processes more efficient.

39. After demonstrating the CRR software to Apprio, Zaccari demonstrated and then

provided it, with Apprio's approval, to DCMA as part of Apprio's responsibilities under the

0001 Contract.  Zaccari did so knowing that the provision of the CRR software to DCMA was

being done as a part of his employment with Apprio, and that Zaccari had assigned to Apprio any

rights he had in the CRR software.

40. The scope of Zaccari's employment with Apprio specifically included advising and

providing business and technical solutions to DCMA with respect to the IWMS and rendering

DCMA's contract receipt and review processes more efficient.  The CRR software (an Excel

macro) was created by Zaccari during the time of and within the scope of Zaccari's employment

by Apprio.  Helping to create such a macro was within the scope of responsibilities for which

Zaccari was hired.

41. The CRR software is a work made for hire, both under Section 101 of the Copyright Act, and Section 2.7 of the Agreement.

42. One of the tasks Apprio undertook as part of the 0001 Contract with DCMA was to provide technical solutions to DCMA to help automate its contract review process.  The CRR software for automating DCMA contract receipt and review processes was related to Apprio's business with DCMA.

43. The CRR software utilized non-public information Zaccari had received from Apprio and DCMA regarding IWMS and DCMA's contract receipt and review processes and was generated as a direct result of Zaccari's work for Apprio in studying the IWMS and DCMA's contract receipt and review processes pursuant to Apprio's responsibilities under the 0001 Contract. Without access to the non-public information Zaccari had received due to his employment by Apprio, and which Apprio had access to pursuant to the 0001 Contract, Zaccari would not have constructed the automated Excel™ macro which is the CRR Software.

44. At all times, Apprio informed Zaccari and Zaccari knew that the CRR software (1) did not belong to Zaccari, but rather was a work made for hire created as part of his work for Apprio, (2) was related to Apprio's business with DCMA under the 0001 Contract, and (3) was created as a result of Zaccari's work for Apprio using knowledge gained as a result of that work and Apprio's obligations under the 0001 Contract.  Zaccari also was told, and further knew, as of the time he provided the software to DCMA, that any intellectual property in the CRR Software had been assigned to Apprio pursuant to the Agreement.

45. In May, 2017, Zaccari's employment with Apprio was terminated.  From that time up to and including the current date, Zaccari has not returned to Apprio all copies of the CRR software

or related documentation.

### E.  Zaccari's Improper Activities Including Fraudulent Copyright Registration and Assertion

46. Nearly a year after his employment with Apprio ended, Zaccari submitted an application for a copyright registration for the CRR software.  As part of the copyright registration application, Zaccari falsely represented to the Copyright Office that the CRR software was not a work made for hire, and that Zaccari was the author and owner of the CRR software.

47. Upon obtaining the copyright registration from the Copyright Office, Zaccari initiated lawsuits against Apprio, the United States, and a government contractor, Discover Technologies LLC ("DT"), alleging, among other things, copyright infringement and trade secret misappropriation relating to the CRR software. Zaccari's lawsuit against Apprio also alleged a breach of the Agreement.

48. In those lawsuits, and despite the numerous requirements in the Agreement that the inventions made by Zaccari during his employment were assigned to Apprio, Zaccari falsely asserted that he was the owner of the CRR software and the copyrights therein. In those lawsuits, and despite the numerous requirements in the Agreement that Zaccari would not engage in any competing business activities or solicit Apprio's customers, Zaccari is seeking $63 million for the alleged use by Apprio, the United States, and DT of the CRR software.

49. As a result of the lawsuits, Apprio has had to engage legal counsel and expend money and other resources to defend itself against Zaccari's false claims of ownership to the CRR software.

50. Since leaving Apprio, Zaccari has represented that, despite his duty of loyalty to Apprio set forth in the Agreement, during the time he was employed by Apprio he was also employed by Capital One bank as a senior manager.  Upon information and belief, during the time of his

employment with Apprio, Zaccari was engaged in employment or business activity other than for Apprio.

## **Count I – Breach of Contract**

51. Apprio realleges and incorporates the allegations set forth in the proceeding and succeeding paragraphs as though fully set forth herein.

52. Apprio and Zaccari entered into the Agreement, a copy of which is attached as Exhibit E, which is a valid contract supported by consideration, on or about November 2, 2015.

53. Pursuant to Section 2.3 of the Agreement, Zaccari assigned and agreed to assign to Apprio all proprietary rights in Company Inventions, including but not limited to, the CRR software.

54. Pursuant to Section 1.3 of the Agreement, Zaccari agreed that he would use proprietary information he received from customers of Apprio only in connection with his work for Apprio.

55. Pursuant to Section 2.2 of the Agreement, Zaccari agreed to provide a royalty-free, worldwide, irrevocable license, with the right to sublicense, to Apprio for any of Zaccari's prior inventions that Zaccari incorporated into an Apprio product during his employment with Apprio, and agreed not to use such inventions at Apprio without Apprio's permission.

56. Pursuant to Section 2.7 of the Agreement, Zaccari agreed that all copyrightable works of authorship made by him within the scope of his employment for Apprio are "works made for hire" under Section 101 of the Copyright Act.

57. Pursuant to Section 2.8 of the Agreement, Zaccari agreed to assist Apprio to obtain copyrights in its inventions, and agreed to execute documents and perform other acts so that Apprio could obtain copyright protection in the CRR software and perfect the assignment of rights in the CRR software from Zaccari to Apprio. Specifically, Zaccari agreed to execute and

deliver assignments of any proprietary rights to Apprio.

58. Pursuant to Section 1.1 of the Agreement, Zaccari agreed that he would not use for his own benefit any proprietary information of Apprio and agreed to assign to Apprio any rights he may have had or acquired in such proprietary information.

59. Pursuant to Section 3.2 of the Agreement, Zaccari agreed that he would not solicit or accept any competing business from any of Apprio's customers during the course of his employment and for a period of two years following the termination of his employment.

60. Pursuant to Section 4 of the Agreement, Zaccari agreed that all records of all proprietary information developed by Zaccari during the term of his employment shall be available to and remain the property of Apprio.

61. Pursuant to Section 5 of the Agreement, Zaccari agreed that during the term of his employment he would not engage in any employment or business activity other than for Apprio, including but not limited to business activity that competes with Apprio.

62. Pursuant to Section 7 of the Agreement, Zaccari agreed that upon the termination of his employment, he would return to Apprio all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing Apprio's inventions or proprietary information of Apprio or its customers.

63. Zaccari, by: (1) failing to assign any rights he is claiming in the CRR software to Apprio, (2) asserting ownership in the CRR software, (3) fraudulently submitting a copyright registration for the CRR software in his own name, (4) retaining the CRR software and/or related documentation after his employment with Apprio was terminated, (5) suing Apprio, the United States, and DT for copyright infringement and trade secret misappropriation, and/or (6) soliciting additional compensation from Apprio and the United States and its contractors with respect to

the CRR software, has breached each and every of the contractual provisions set forth above.

64. As a direct and proximate result of these breaches, Apprio has been and will continue to be harmed.  Particularly, Apprio has at least lost the benefit of ownership of the CRR software, has been forced to expend resources to defend itself against Zaccari's lawsuit and to seek a declaration of its ownership of any rights in the CRR software and to bring the current lawsuit to enforce its rights under the Agreement, and has been placed in the position of having a former employee harass and solicit money from its customer, causing it further reputational and business injury.  Also, under Section 11.7 of the Agreement, Apprio is entitled to recover its reasonable attorneys' fees associated with bringing the current Complaint against Zaccari to enforce its rights under the Agreement.

65. In addition to the harm that can be compensated through monetary damages, Apprio is being irreparably harmed by Zaccari's breach of the Agreement, and will continue to be irreparably harmed unless and until Zaccari is: (1) enjoined from asserting ownership over the CRR software, (2) required to return to Apprio all copies of the CRR software and associated documentation in his possession, (3) enjoined from soliciting, harassing and pursuing lawsuits against Apprio and Apprio's customers relating to the CRR software; and (4) required to comply with the provisions of paragraph 2.8 of the Agreement and execute any paperwork required to either cancel any copyright registrations Zaccari has filed on the CRR Software due to his fraud or properly transfer ownership of any copyright registrations Zaccari has filed on the CRR Software to Apprio.  Pursuant to Section 8 of the Agreement, Zaccari agreed that Apprio may sustain such irreparable injuries as a result of Zaccari's breach of the Agreement, and that in order to limit such irreparable injury, Apprio has the right to enforce the Agreement through injunction, specific performance, and equitable relief.

15

66. Apprio is entitled to a declaration that the CRR software was a work made for hire and/or that Zaccari assigned any rights he had in the CRR software, including copyrights or trade secret rights, to Apprio. Apprio is also entitled to an injunction requiring Zaccari to execute a formal assignment of his copyright registration in the CRR software to Apprio, requiring Zaccari to cease and desist from initiating or pursuing lawsuits relating to the CRR software, including his current lawsuits against Apprio, the United States and DT, requiring Zaccari to provide Apprio with any and all copies of the CRR software and associated documentation in his possession, and requiring Zaccari to cease and desist from attempting to solicit any business, or obtain money or other consideration from Apprio or any of its customers with respect to the CRR software.

## Count II – Declaratory Judgment

67. Apprio realleges and incorporates the allegations set forth in the proceeding and succeeding paragraphs as though fully set forth herein.

68. There currently exists between Apprio and Zaccari a dispute regarding the ownership of the CRR software and intellectual property rights, including copyrights, in the CRR software. Zaccari, by obtaining a copyright registration for the CRR software in his name and asserting that copyright registration in litigation, asserts that he is the owner of the CRR software and rights in the CRR software.

69. Pursuant to the Agreement between Apprio and Zaccari, and also because it is a work made for hire under the Copyright Act, Zaccari is not the owner of the CRR software or rights to the CRR software. Rather, those rights have been assigned to or otherwise belonged in the first instance to Apprio.

70. Apprio is entitled to a declaration pursuant to 28 U.S.C. § 2201 that Zaccari is not the owner of and has assigned to Apprio the CRR software and all intellectual property rights to the

16

CRR software, including any copyrights in the CRR software.

**PRAYER FOR RELIEF**

WHEREFORE, Apprio respectfully prays that this Court grant judgment in its favor that Zaccari has breached the Agreement and enter:

A.      An order that Zaccari does not own and has assigned to Apprio any rights to the CRR software and any copyrights or other intellectual property in the CRR software;

B.      An injunction against further breach of the Agreement by Zaccari and each of his agents, employees, servants, attorneys, successors, and assigns, and all others in privy or acting in concert with any of them, including an injunction against: (1) initiating or continuing any litigation against Apprio, the United States, DT, or any other Apprio customer involving the CRR software; and (2) requesting compensation in any fashion from Apprio, the United States, DT or any other Apprio customer with respect to the CRR software;

C.      An order requiring Zaccari to relinquish all copies of the CRR software and related documentation to Apprio;

D.      An order requiring Zaccari to formally assign the copyright registration he filed for the CRR software to Apprio;

E.      An order requiring Zaccari to remit to Apprio all actual damages in an amount to be determined at trial, including Apprio's expenses and attorneys' fees related to defending the lawsuits Zaccari initiated against Apprio, the United States, and DT, along with prejudgment and post-judgment interest;

F.      An order awarding Apprio its reasonable costs and attorneys' fees in bringing this Action to enforce its rights under the Agreement; and

G.    An order granting such other relief as the Court deems just and proper.

Dated: September 21, 2018          **BANNER & WITCOFF, LTD.**

*/s/ John R. Hutchins*

_____

John R. Hutchins (Bar No. 456749)
Christopher Roth (Bar No. 473052)
**BANNER & WITCOFF, LTD.**
1100 13th St., NW Suite 1200
Washington, DC 20005
Telephone:     202.824.3000
Facsimile:      202.824.3001
jhutchins@bannerwitcoff.com
croth@bannerwitcoff.com

***Attorneys for Apprio, Inc.***