## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**APPRIO, INC.,**

**Plaintiff,**

**v.**

**NEIL ZACCARI,**

**Defendant.**

**Civil Action No. 18-2180 (JDB)**

## <u>MEMORANDUM OPINION</u>

Apprio, Inc., a government contractor, brings this suit against a former employee, Neil Zaccari, for breach of contract, seeking a declaratory judgment. The dispute involves intellectual property rights in a software program that Zaccari developed while working at Apprio. Apprio has moved for partial summary judgment concerning the contractual assignment of rights in this software program. Apprio claims that Zaccari contractually assigned his intellectual property rights in the software to Apprio. Zaccari responds that he is not bound by the contract Apprio has identified and that, even if he is, its terms do not apply to the specific software program at issue. Because Zaccari did in fact objectively manifest his assent to the contract and because its unambiguous terms do cover the software at issue, the Court will grant Apprio's motion.

## <u>Background</u>

From 2014 to 2017 Apprio performed work for the Defense Contract Management Agency ("DCMA"), a federal agency organized under the Department of Defense to facilitate and monitor the work of its government contractors. Def.'s Resp. to Pl.'s Stmt. of Undisputed Material Facts ("Resp. SUMF") [ECF No. 34-2] ¶¶ 1–3. DCMA hired Apprio to work on the implementation of

software and automated processes and to help DCMA develop an Integrated Workload Management System ("IWMS"), all of which would facilitate more efficient receipt and review of government contracts by DCMA.  See generally id. ¶¶ 4–16.

Defendant Neil Zaccari worked for Apprio from November 2, 2015 until approximately May 11, 2017.  Id. ¶¶ 19, 30.  During this time he worked on Apprio's DCMA projects.  Id. ¶ 20. While employed with Apprio, on or before June 15, 2016,[1] Zaccari was presented with a document titled "Proprietary Information and Assignment of Inventions Agreement" (the "Agreement"). Resp. SUMF ¶¶ 21–22; Pl.'s SUMF Ex. J, Agreement [ECF No. 31-14].  Zaccari agrees that he "acknowledge[d]" receiving it but disputes having "assented to be bound by" its terms.  Resp. SUMF ¶ 22.  Specifically, Zaccari says he was notified that "there was a policy for [him] to review" in Apprio's Human Resources software and that, after logging into that software, the text of the Agreement was displayed on his computer screen.  Zaccari Decl. [ECF No. 34-4] ¶¶ 14–16.  He "press[ed] a button" on the screen that read "Acknowledge," but says he "was . . . never told that 'agreeing' to the document was a condition of [his] employment" and "didn't understand [him]self to be signing a contract that would bind [him]."  Id. ¶ 16.

While the legal status of the Agreement is the subject of significant dispute—thoroughly discussed below—the text of the Agreement's key terms is not.  In addition to the assignment of inventions provisions at issue in this case, the Agreement also contains provisions addressing non-disclosure of company information, duties of loyalty and non-competition, an at-will employment provision, details on remedies, and other terms.  Section 2 of the Agreement concerns the

---

[1] In a prior lawsuit involving the same parties and the same subject matter (discussed in more detail below), the parties disagreed on when the Agreement was presented to Zaccari, but they are now in agreement that he was presented with it and acknowledged it "no later than June 15, 2016."  MSJ Br. at 5; Stmt. of Undisputed Material Facts in Supp. of Apprio Inc.'s Mot. ("Pl.'s SUMF"), [ECF No. 31-2] ¶ 21; Resp. SUMF. ¶ 21 (not disputing plaintiff's timeline).

assignment of "Inventions" and "Proprietary Rights," the latter of which is defined as "all trade secret, patent, copyright, mask work and other intellectual property rights throughout the world." Agreement ¶ 2.1.  The Agreement states that an Apprio employee consenting to its terms will "[t]hereby assign and agree to assign in the future . . . to [Apprio] all [of the employee's] right, title and interest in and to any and all Inventions (and all Proprietary Right with respect thereto) . . . ."  Id. ¶ 2.3.  This applies, with some significant exceptions discussed in detail below, to all inventions "whether or not patentable or registrable under copyright or similar statutes" so long as they are "made or conceived or reduced to practice . . . during the period of" employment with Apprio.  Id.

The assignment of rights has become a point of contention between the parties because while he was employed by Apprio, Zaccari developed a piece of software using Microsoft Excel Macros—the "CRR Software."  Compl. [ECF No. 1] ¶¶ 37, 40; Am. Answer [ECF No. 20] ¶¶ 37, 40 (not disputing these facts).  The CRR Software "automated the DCMA's manual contract receipt and review process."  Am. Answer ¶ 42.  Zaccari says he created the CRR Software "independently" and "on his own time."  Id. ¶ 40.  He has been less clear about when exactly he created it.  In his Amended Answer Zaccari states that he created the CRR Software "during the time period [when] he was also an employee of Apprio," id., but his subsequent Declaration indicates that the CRR Software is better described as having developed out of a base code that he developed in 2008 and then updated while working for Apprio, Zaccari Decl. ¶¶ 4–5, 9–10.  Either way, there is no dispute that while working on Apprio's DCMA projects, Zaccari "informed Apprio that he could use the existing capabilities of an Excel macro to automate the DCMA's manual contract receipt and review process."  Am. Answer ¶ 37.

The parties disagree regarding the timing of the events that followed.  Zaccari says he told Apprio what he could do with an Excel macro "after [he had] independently creat[ed] his CRR software," id., while Apprio suggests that Zaccari told Apprio that it would be possible to create the software before he actually did so, Compl. ¶ 37.  The parties agree that Zaccari brought his creation into work and demonstrated it to his colleagues, and possibly to at least one DCMA official, though Zaccari's statements about this have been inconsistent.  Zaccari Decl. ¶¶ 12–13 (describing Zaccari's intent "to show [the CRR Software] to [his] colleagues and a senior level government employee" and indicating that he did "a few demonstrations for different colleagues"); Compl. ¶ 39 (alleging that Zaccari "demonstrate[d] the CRR software to Apprio" and then "demonstrated and then provided it . . . to DCMA"); but see Am. Answer ¶ 39 (disputing Compl. ¶ 39 in its entirety).  Apprio says that Zaccari "provided [the CRR Software] . . . to DCMA," Compl. ¶ 39, while Zaccari says Apprio "took [his] software" after threatening his job, Zaccari Decl. ¶ 13.  Either way, no one disputes that DCMA ended up using the software.  Compl. ¶ 39 ("Zaccari . . . provided [the software] . . . to DCMA as part of Apprio's responsibilities"); Zaccari Decl. ¶ 13 ("DCMA . . . deployed it to thousands of their employees").

The parties' dispute over proprietary rights in the CRR Software began from there.  Zaccari's employment was terminated in May 2017, and he has since refused Apprio's demands that he turn over all copies of the CRR Software in his possession.  Compl. ¶ 45; Am. Answer ¶ 45.  He has also refused to execute a formal assignment of property rights in the CRR Software to Apprio.  Resp. SUMF ¶ 49.  In April 2018, he applied for a copyright registration for the CRR Software.  Compl. ¶ 46; Am. Answer ¶ 46; Pl.'s SUMF Ex. N, Copyright Registration [ECF No. 31-18].  Zaccari then filed a lawsuit against Apprio in June 2018, alleging that Apprio had breached the Agreement, infringed on his copyright in the CRR Software, unlawfully conspired with DCMA

against him, and misappropriated trade secrets.  Compl. ("1560 Compl.") at 10–14, Zaccari v. Apprio, Inc., No. 18-cv-1560 (D.D.C. Jun. 29, 2018) [ECF No. 1].  The parties refer to that prior lawsuit as "the 1560 litigation" in reference to its case number.  Apprio filed the instant lawsuit against Zaccari a few months later.

The 1560 litigation and this case were both before this Court, and in 2019 the Court consolidated them pursuant to Federal Rule of Civil Procedure 42(a).  Order (Jan. 11, 2019), Zaccari, No. 18-cv-1560 [ECF No. 15].  Apprio successfully moved to dismiss Zaccari's complaint against it for lack of subject matter jurisdiction and failure to state a claim.  Zaccari v. Apprio, Inc., 390 F. Supp. 3d 103, 106 (D.D.C. 2019).  The Court held that it lacked jurisdiction over Zaccari's copyright infringement and conspiracy claims and that he had failed to state a claim for breach of contract or misappropriation of trade secrets.  Id. at 108–14.  The Complaint in the 1560 litigation was dismissed, id. at 114, and the Court deconsolidated the two cases, see Order (Aug. 27, 2019), [ECF No. 15].  No appeal of that decision was taken.

Following discovery in this case, Apprio filed the instant motion for partial summary judgment.  Apprio Inc.'s Mot. for Summ. J. on Contractual Assignment of Rights ("Mot.") [ECF No. 31].  Apprio seeks summary judgment "regarding the contractual assignment of any rights Zaccari has in the CRR Software, including assignment of all rights Zaccari may have in" his copyright registration.  Id. at 1; see also Mem. in Supp. of Apprio Inc.'s Mot. for Summ. J. on Contractual Assignment of Rights ("MSJ Br.") [ECF No. 31-1].  Zaccari opposes the motion. Zaccari's Mem. of P. & A. in Opp'n to Apprio, Inc.'s Mot. ("Opp'n") [ECF No. 34].  The motion is now fully briefed and ripe for resolution.  See Reply Mem. in Supp. of Apprio Inc.'s Mot. ("Reply") [ECF No. 39].

## **Legal Standard**

Summary judgment is appropriate where "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a 'material' fact." Etokie v. Duncan, 202 F. Supp. 3d 139, 145 (D.D.C. 2016) (citation omitted). Hence, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment may not "be avoided based on just any disagreement as to the relevant facts; the dispute must be 'genuine,' meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant." Etokie, 202 F. Supp. 3d at 146 (quoting Anderson, 477 U.S. at 248).

The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52. Thus, a nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted," Anderson, 477 U.S. at 249–50 (citations omitted). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by" either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, . . . or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. See Ass'n of Flight Attendants–CWA v. U.S. Dep't of Transp., 564 F.3d

462, 465–66 (D.C. Cir. 2009).

The Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson, 477 U.S. at 255.  Moreover, a court may not "make credibility determinations or weigh the evidence."  Lopez v. Council on American–Islamic Relations Action Network, Inc., 826 F.3d 492, 496 (D.C. Cir. 2016) (citation omitted).  Rather, the court's role at summary judgment is to resolve legal questions, while viewing the evidence in the light most favorable to the nonmoving party.  See Robinson v. Pezzat, 818 F.3d 1, 8 (D.C. Cir. 2016) (citing Anderson, 477 U.S. at 255).

Finally, a party's response to Rule 36 Requests for Admission may provide a basis for summary judgment.  Federal Rule of Civil Procedure 36 states that "[a] party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of [discovery] relating to . . . facts, the application of law to fact, or opinions about either."  Fed. R. Civ. P. 36(a)(1).  The purpose of such requests is "to narrow the scope of issues to be litigated and thereby expedite the litigation process."  Harris v. Koenig, 271 F.R.D. 356, 372 (D.D.C. 2010) (quoting Kendrick v. Sullivan, No. 83-CV-3175, 1992 WL 119125, at *3 (D.D.C. May 15, 1992)).  "A matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  Fed. R. Civ. P. 36(b).  "[W]here the 'facts that are admitted under Rule 36 are "dispositive" of the case'"—or dispositive of the issues on which a party has moved for summary judgment—"'then it is proper for the district court to grant summary judgment.'"  Essroc Cement Corp. v. CTI/D.C., Inc., 740 F. Supp. 2d 131, 140–41 (D.D.C. 2010) (quoting Quasius v. Schwan Food Co., 596 F.3d 947, 950–51 (9th Cir. 2010)); see also § 2264 Use and Effect of Admissions, 8B Fed. Prac. & Proc. Civ. § 2264 (3d ed.) ("Admissions obtained under Rule 36 may show that there is no genuine issue as to

any material fact and justify the entry of summary judgment under Rule 56" provided that "the admissions are [not] uncertain" and have not been withdrawn).

## Analysis

To prevail on a claim for breach of contract under District of Columbia law,[2] a plaintiff must establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) breach of that obligation or duty, and (4) damages caused by that breach.  See Brown v. Sessoms, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009)); Francis v. Rehman, 110 A.3d 615, 620 (D.C. 2015).  The instant motion concerns the first two of these elements and presents two questions.  First, is the Agreement a binding contract between Apprio and Zaccari?  Second, if the Agreement is a binding contract, does it dictate that Zaccari assigned his rights to the CRR Software?

### I.    Contract Formation

The first point of disagreement between the parties concerns whether the Agreement is an enforceable contract and specifically whether Zaccari consented to be bound by its terms, or whether he merely acknowledged that he had received it from Apprio.  Under D.C. law, "[f]or an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound."  United House of Prayer for All People v. Therrien Waddell, Inc., 112 A.3d 330, 337–38 (D.C. 2015) (quoting Georgetown Ent. Corp. v. Dist. of Columbia, 496 A.2d 587, 590 (D.C. 1985)).  "While agreement as to material terms 'is most clearly evidenced by the terms of a signed written agreement . . . such a signed writing is not essential to the formation of a contract.'"  Id. at 338 (quoting Kramer Assocs., Inc. v. Ikam, Ltd., 888 A.2d 247,

---

[2] District of Columbia law governs the Agreement, by its terms.  Agreement ¶ 11.1.  While Zaccari argues that he is not bound by the Agreement, he does not dispute that the Court should apply D.C. law when deciding whether a contract exists in the first instance.  See Opp'n at 6–10 (citing D.C. law).

252 (D.C. 2005)).  The intention to be bound by the terms of an agreement "can be found from written materials, oral expressions and the actions of the parties."  Duffy v. Duffy, 881 A.2d 630, 637 (D.C. 2005).  "[R]egardless of the parties' actual, subjective intentions, the ultimate issue is whether . . . they objectively manifested a mutual intent to be bound contractually."  E.M. v. Shady Grove Reprod. Sci. Ctr. P.C., 496 F. Supp. 3d 338, 394–95 (D.D.C. 2020) (quoting Dyer v. Bilaal, 983 A.2d 349, 357 (D.C. 2009)); see also Northland Cap. Corp. v. Silver, 735 F.2d 1421, 1426–27 n.7 (D.C. Cir. 1984) ("The principle that objective manifestation of intent is controlling in contract formation is very well established.").

Apprio, as the party asserting the existence of a contract, bears "the burden of proving that one existed."  Kramer Assocs., 888 A.2d at 251; Phillips v. Spencer, 390 F. Supp. 3d 136, 167 (D.D.C. 2019).  "The determination whether an enforceable contract exists," whether in the form of a written or oral contract, "is a question of law" to be resolved by the Court in most cases. Rosenthal v. Nat'l Produce Co., 573 A.2d 365, 369 n.9 (D.C. 1990) (citing Georgetown Ent. Corp., 496 A.2d at 590); Phillips, 390 F. Supp. 3d at 167.

Apprio argues that "Zaccari agreed to be bound by the Agreement" and that he did so "[i]n consideration of his employment with, and salary from, Apprio."  MSJ Br. at 6.  Apprio's Statement of Undisputed Material Facts does not directly assert that a contract was formed but states instead that "[t]he Agreement was provided to and acknowledged by Mr. Zaccari during his employment with Apprio" and that "Zaccari had a number of obligations under the Agreement." Pl.'s SUMF ¶¶ 22–23.  Zaccari responds that Apprio "has provided no evidence that [he] assented to be bound by the terms of the Agreement, was offered or received any consideration for agreeing to be bound by the terms of the Agreement, or did anything more concerning the Agreement than acknowledge its receipt."  Resp. SUMF ¶ 22–23.

In fact, Apprio has provided evidence in support of its position.  To start, Apprio has produced an electronic record indicating that Zaccari acknowledged the Agreement on June 15, 2016.  Pl.'s SUMF ¶ 22 (citing, <u>inter alia</u>, Pl.'s SUMF Ex. K [ECF No. 31-15]).  Zaccari, of course, does not dispute that he "acknowledge[d]" receiving the Agreement.  Resp. SUMF ¶ 22.  Apprio also points to certain of Zaccari's responses to Requests for Admission which confirm that Zaccari sought to enforce the Agreement against Apprio in the 1560 litigation.  <u>See</u> Pl.'s SUMF ¶ 22 (citing Pl.'s SUMF Ex. H, Def.'s Objs. & Resps. to Pl.'s First Reqs. for Admiss. ("Def.'s RFA Resps.") [ ECF No. 31-12]); <u>see also</u> Def.'s RFA Resps. at 2.  Elsewhere, Apprio argues that Zaccari is bound by assertions he made in the 1560 litigation and his Amended Answer can be read as containing an admission that he was bound by the Agreement.  MSJ Br. at 7; Reply at 5–6.  To argue that no contract was formed, Zaccari points to the text of the Agreement, to the electronic record stating that he "acknowledged"—rather than "agreed to"—it, and to his and a former co-worker's declarations concerning their understanding of the Agreement.  Resp. SUMF ¶¶ 22–23 (citing Agreement & Pl.'s SUMF Ex. K); Opp'n at 7–9 (citing Zaccari Decl. & Jenkins Sink Decl. [ECF No. 34-5]).

Apprio has the better of this dispute because, even looking only at the evidence Zaccari relies on, it is sufficiently clear that in acknowledging the Agreement Zaccari objectively manifested his assent to its terms.  While he is correct that he never signed the Agreement as one would sign a prototypical contract, "[t]he manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."  Restatement (Second) of Contracts § 91(1) (1981).  The text of the Agreement and the context in which it was presented made it objectively clear that Apprio intended that its employees would manifest their assent to the Agreement by the act of clicking "acknowledge," and this is what Zaccari did.

Zaccari's argument that he never entered into the Agreement with Apprio relies on the notion that the Court should find some meaningful difference between "acknowledging" the Agreement and "signing" or "agreeing to" it.  In some contexts, such a difference might exist, but the Court does not believe that any difference can be found here.  Zaccari does not deny having had the opportunity to read the Agreement.  By his own account, he opened the Agreement in June 2016 and "saw that the document . . . was called 'Proprietary Information and Assignment of Inventions Agreement.'"  Zaccari Decl. ¶ 15.  He therefore knew, even if he read nothing more than the title of the document, that he was being presented with an <u>agreement</u>.[3]  The Agreement begins by identifying a crucial element of contract formation—the consideration Zaccari will receive in exchange for agreeing to the terms presented.  It reads: "In consideration of my being retained as a consultant with or employee of Apprio, Inc . . . and the consideration now and hereafter paid to me, I hereby agree as set forth herein."  Agreement at 1.

Zaccari clicked a button that said "acknowledge," not "agree," but the terms and context of the contract make clear that no distinction should be drawn on this basis.  While the opening paragraph of the Agreement uses the word "agree," the final paragraph treats the two verbs as equivalent and connects them each to the notion of signing a more traditional hard-copy written contract: "I acknowledge and agree that the language herein shall be deemed to be approved by all parties hereto . . . and that I have had an opportunity to consult with an attorney regarding the terms

---

[3] It is unlikely that this was the first time Zaccari encountered a contract presented on a computer screen with the option for the user to manifest agreement by clicking a button, and he does not argue otherwise.  The tech-savvy Zaccari is undoubtedly familiar with the "clickwrap" agreements frequently encountered by consumers using software or engaging in online transactions.  <u>See, e.g.</u>, <u>Forrest v. Verizon Commc'ns, Inc.</u>, 805 A.2d 1007, 1010 (D.C. 2002) (describing an internet service contract which a consumer "entered into by the subscriber clicking an 'Accept' button below the scroll box"); <u>Selden v. Airbnb, Inc.</u>, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016) ("Courts and commentators have identified a number of variations of these electronic agreements, including 'browsewraps,' 'clickwraps,' 'scrollwraps,' and 'sign-in-wraps.'").  Today it is not uncommon for a computer user to be presented with an extensive set of contractual terms with only the option of agreeing to these terms or abandoning the use of a particular website, service, or piece of software.

herein prior to signing this Agreement." Id. ¶ 11.9.  (emphasis added).  The reference to "signing" the Agreement does not detract from the equivalence drawn between acknowledgment and agreement.  No signature line is present, so it is clear from context that Apprio did not expect a signature.  Zaccari has said that the Apprio Human Resources system did not display any instructions about, for example, printing and signing the Agreement.  Zaccari Decl. ¶ 16 ("There was no text other than the document itself.").  He therefore had no reason to think that Apprio expected a more formal acceptance of the Agreement.  Further, under D.C. law, even an unsigned written contract can be enforced if there is sufficient evidence from the parties' conduct to show that they manifested their assent to be bound.  Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995); see also M.R.S. Enters., Inc. v. Sheet Metal Workers' Int'l Ass'n, Loc. 40, 429 F. Supp. 2d 72, 78 (D.D.C. 2006).  The lack of a signature is therefore not a per se bar to contract formation.

Given the context of an electronically-presented Agreement, with no signature line and no opportunity for a digital signature, the terms of the Agreement make it clear that "acknowledge" is the key verb, and the Agreement's final paragraph clarifies that acknowledgment will be treated as equivalent to a signature.  If Zaccari had read the Agreement—he does not say whether he did but does not deny having had the opportunity to do so—he should have understood that he was agreeing to be bound by its terms and that he was receiving continued employment with Apprio as consideration.[4]  Zaccari does not dispute that he clicked the "Acknowledge" box that was presented to him and thus "acknowledged" the Agreement on June 15, 2016.  Resp. SUMF. ¶¶ 21–22; Zaccari Decl. ¶ 16.  He saw the text of the document but says he did not "understand [himself]

---

[4] The Declaration of Zaccari's former co-worker, Mary Jenkins Sink, adds nothing to help his arguments. She says that she also received the Agreement from Apprio and that "[t]here was no text or warning that stated that clicking the 'Acknowledge' button constituted [her] signature or agreement to be bound by the document."  Jenkins Sink Decl. ¶ 6.  As the Court has explained, this is not an accurate description of the Agreement, especially considering the context in which it was presented.

to be signing a contract that would bind [him], or that signing was a requirement to keep [his] job." Zaccari Decl. ¶ 16.  But Zaccari has offered no reason why "acknowledging" a contract with terms that treat acknowledgment as agreement should be any less binding than signing it would be. District of Columbia courts have "consistently adhered to a general rule that one who signs a contract has a duty to read it and is obligated according to its terms. . . . [A]bsent fraud or mistake, one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not."  <u>Pyles v. HSBC Bank USA, N.A.</u>, 172 A.3d 903, 907 (D.C. 2017); <u>Proulx v. 1400 Pennsylvania Ave., SE, LLC</u>, 199 A.3d 667, 672 (D.C. 2019).   Because acknowledging the Agreement amounts to signing it in this context, Zaccari is bound by its terms.

In a footnote, Zaccari argues that the Copyright Act's statute of frauds ought to preclude the formation of a contract here.  Opp'n at 6 n.1.  The Copyright Act requires that "[a] transfer of copyright ownership . . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  Zaccari suggests that there is no "signed Agreement" here and that therefore "any doubt . . . is construed in favor of the original copyright holder."  Opp'n at 6 n.1.  This argument overlooks the E-SIGN Act, which says that "[n]otwithstanding any statute . . . (1) a signature, contract, or other record . . . may not be denied legal effect, validity, or enforceability solely because it is in electronic form; and (2) a contract . . . may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation."  15 U.S.C. § 7001(a).  For purposes of the E-SIGN Act, "[t]he term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record," and an "electronic record" is "a contract or other record created, generated, sent,

communicated, received, or stored by electronic means.." Id. § 7006(4–5).  By acknowledging the Agreement with a click of his mouse, Zaccari carried out a "process . . . logically associated with" the Agreement, and did so intentionally.  Apprio has produced an electronic record of this process, Pl.'s SUMF Ex. K, the validity of which Zaccari does not dispute, Resp. SUMF ¶¶ 22–23 (citing Pl.'s SUMF Ex. K).  Because of the E-SIGN Act, this evidence is as good as a written signature.  Hence, even if Zaccari were correct that "any doubt . . . is construed" in his favor, his acknowledgment left no doubt about his consent.  The Copyright Act's statute of frauds therefore does not bar the assignment of his copyright interest.[5]

Zaccari's conduct surrounding the Agreement also reflects an objective manifestation of an intent to be bound contractually.  In the District of Columbia, following the rule of the Second Restatement of Contracts, an offeree may be entirely silent in response to an offered contract and still be bound by its terms if "it is reasonable that the offeree should notify the offeror if he does not inten[d] to accept" and if "the offeree has taken the offered benefits." Steuart Inv. Co. v. The Meyer Grp., Ltd., 61 A.3d 1227, 1236 n.10 (D.C. 2013) (quoting William F. Klingensmith, Inc. v. Dist. of Columbia, 370 A.2d 1341, 1343 (D.C. 1977) (adopting the Restatement rule)); Restatement (Second) of Contracts § 69 cmt. b (1981).  Here, Zaccari accepted the benefits described in the Agreement ("being retained as a[n] . . . employee of Apprio, Inc.") and continued receiving pay.   Zaccari never followed up with Apprio's Human Resources office to ask any questions about the Agreement or to object to any of its terms.  Moreover, Zaccari was hardly "silent" when presented with the Agreement: he provided the only acknowledgement that Apprio

---

[5] Even if the statute of frauds did apply, it would apply to the transfer of a "copyright ownership." 17 U.S.C. § 204(a).  The Agreement purports to transfer "all . . . right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto)." Agreement ¶ 2.3.  This is arguably a broader set of intellectual property rights than just "copyright ownership."  As a result, even if the statute of frauds did bar the assignment of Zaccari's copyright ownership here, he might still have assigned other intellectual property interests to Apprio, and Apprio's motion might therefore still be granted in part.

expected.  See Pl.'s SUMF Ex. K (electronic record of assent).  It is unreasonable for an employee

to say nothing to his employer if he intends not to be bound by the kinds of provisions included in

the Agreement—not just the assignment of rights, but duties of loyalty, confidentiality, and non-

disclosure and non-solicitation provisions.  Employers rarely treat these kinds of provisions as

optional.  Despite his assertion that he did not intend to be bound, there was no way that Apprio,

or anyone else, could have known this was his subjective mental state.

Zaccari continued to objectively manifest an understanding that he was bound by the

Agreement up through the initiation of the 1560 litigation, by which he attempted to enforce the

Agreement against Apprio.[6]  1560 Compl. at 10; see Weickert v. Nat. Prods. Ass'n, No. 16-cv-

142, 2017 WL 6334074, at *1 (D.D.C. Mar. 31, 2017) (holding based on a review of the undisputed

facts that an employee "manifested his assent to [the] terms" contained in an employee handbook

"by working at [the employer]" and, among other ways, by "avail[ing] himself of" grievance

procedures contained in the handbook).  This is not to say that Zaccari's current protestations are

not credible, since the Court cannot make a credibility determination at this stage of the litigation.

Lopez, 826 F.3d at 496.  The Court simply views the fact that Zaccari tried to enforce the

Agreement as one further undisputed piece of evidence suggesting that he did manifest an intent

to be bound by it.

Zaccari says he "never understood himself to be bound by the Agreement nor did he intend

to be bound by the Agreement," Opp'n at 8, but the law of the District is quite clear that a party's

subjective understanding is not what matters when a Court is determining whether two parties have

---

[6] This is not to say that Apprio is correct in its argument that Zaccari's pleadings in the 1560 litigation constitute an admission to which Zaccari is still bound.  See Reply at 3–5; see also MSJ Br. at 7.  The Court need not decide that issue because it finds as a matter of law that Zaccari objectively manifested an intent to enter into the Agreement.  The same goes for Apprio's related arguments concerning Zaccari's Responses to Requests for Admission and his Amended Answer that focus on the 1560 litigation.  Reply at 3–6.

formed a contract.  "[R]egardless of the parties' actual, subjective intentions, the ultimate issue is whether, by their choice of language . . . , they objectively manifested a mutual intent to be bound contractually."  Dyer, 983 A.2d at 357 (quoting 1836 S St. Tenants Ass'n, Inc. v. Estate of Battle, 965 A.2d 832, 837 (D.C. 2009)); Hernandez v. Banks, 65 A.3d 59, 70 (D.C. 2013); Hart v. Vt. Inv. Ltd. P'ship, 667 A.2d 578, 583 (D.C. 1995) ("A party's 'claimed intent is immaterial, where it has agreed in writing to a clearly expressed and unambiguous intent to the contrary.'" (quoting Ray v. William G. Eurice & Bros., Inc., 93 A.2d 272, 278 (Md. 1952))).  Because Zaccari objectively manifested his intent to be bound by the terms of the Agreement, through both his "acknowledgement" of the Agreement and his subsequent conduct, his argument fails.

## II.    Assignment of Rights

The remaining points of contention concern the interpretation of the Agreement, which the Court has now determined is a binding contract between Apprio and Zaccari.  District of Columbia courts "adhere[] to an 'objective' law of contracts," and will give effect to the clear terms of an agreement "'[regardless] of the intent of the parties at the time they entered into  the contract.'" Dyer, 983 A.2d at 354–55 (quoting DSP Venture Grp., Inc. v. Allen, 830 A.2d 850, 852 (D.C. 2003)).  "In construing a contract, the court must determine what a reasonable person in the position of the parties would have thought the disputed language meant."  Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1064 (D.C. 2008) (quotation omitted).  "Where the language in question is unambiguous, its interpretation is a question of law for the court."  Id. (quotation omitted).

In broad terms, Apprio argues that Zaccari has given up his intellectual property rights in the CRR Software, and Zaccari argues that he has not done so even if he is bound by the Agreement.  The Court's analysis will begin with a detailed review of the key terms of the

Agreement.  Next, the Court will address several of Zaccari's arguments and explain how they misconstrue the Agreement.  Last, mindful that Apprio, as the party seeking summary judgment, bears the burden of demonstrating the absence of a genuine dispute of material fact, see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), the Court will review Apprio's arguments on their own terms.

Paragraph 2.3 of the Agreement states, in relevant part:

**2.3     Assignment of Inventions.**  Subject to Sections 2.4, and 2.6, I hereby assign and agree to assign in the future . . . to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of My Service.

Agreement ¶ 2.3.  Inventions assigned under this section are termed "Company Inventions."  Id. The Agreement establishes a few types of inventions that do not become "Company Inventions" under paragraph 2.3.  Id. ¶¶ 2.2, 2.4.  First, under paragraph 2.4, "Unassigned Inventions" remain an employee's own.  Id. ¶ 2.4.  These are inventions "developed entirely on [the employee's] own time without using [Apprio's] equipment, supplies, facilities, or trade secrets and neither related to [Apprio's] actual or anticipated business, research or development, nor resulted from work performed by [the employee] for [Apprio]."  Id.

The second category of exempted inventions, "Prior Inventions," has a somewhat more complicated definition, as set forth in paragraph 2.2.  Id. ¶ 2.2.  "Prior Inventions" are those that "[an employee] made prior to the commencement of" employment with Apprio.  Id.  An employee assenting to the Agreement agrees that he or she has "set forth on a Previous Inventions Disclosure Form . . . a complete list of all Inventions . . . conceived, developed or reduced to practice . . . prior to the commencement of" employment with Apprio.  Id.  The point of this Form is to "preclude any possible uncertainty" over who owns the Invention.  Id.  By the terms of the Agreement "[i]f

17

no such disclosure is made, [the employee] represent[s] that there are no Prior Inventions."  Id.
Even if a disclosure is made, though, "[i]f, in the course of . . . Service, [the employee]
incorporate[s] a Prior Invention into a Company product, process or machine," then Apprio does
receive "a nonexclusive royalty-free, irrevocable, perpetual, worldwide license . . . to make, have
made, modify, use and sell such Prior Invention."  Id.  Finally, establishing a third category of
exempt inventions, the Agreement explains that Prior Invention disclosures do not have to include
those "developed . . . prior to the commencement of" employment with Apprio, if the employee
does not use them "in connection with" work for Apprio.  Id.

Zaccari argues that even if he is bound by the Agreement, he did not assign to Apprio any
rights in the CRR software.  He insists that the "CRR Software includes two components: a base
code and an update to the base code."  Opp'n at 12.  According to Zaccari's Opposition brief, he
developed the base code in 2008 and it should fall in the third category—established in Agreement
paragraph 2.2—of inventions developed prior to the commencement of employment with Apprio,
which do not need to have been disclosed as Prior Inventions.  Id. at 12–14.  He then argues that
the updates are exempt "Unassigned Inventions" that he developed in 2016 on his own time and
without using company resources.  Id. at 14–15.  But both these arguments fail because they
overlook the clear and unambiguous language in the Agreement.

Zaccari's argument concerning the creation of a "base code" in 2008 demonstrates the
flaws with his arguments in opposition more generally.  He says that "[t]he base code was
developed in 2008, long before [his] employment at [Apprio]," and he cites to an expert report that
he says supports this notion.  Id. at 12–13 (citing Decl. of Kirk T. Schroder, Ex. A, Expert Report
of Gregory G. Crouse ("Crouse Rept.") [ECF No. 34-3]).  He then points to the language in
paragraph 2.2. stating that an employee does not have to disclose, as a "Prior Invention," any

invention "created 'prior to the commencement of [employment] if [the employee does] <u>not</u> use such inventions in connection with [his employment].'"   <u>Id.</u> at 13 (quoting Agreement ¶ 2.2). There are a few problems with this line of argument.

To start, even assuming that the expert report creates a genuine dispute of fact concerning the existence of a 2008 base code,[7] it does nothing to further Zaccari's argument that he did not agree to turn over intellectual property rights in the CRR Software.   He first says that he "was not obligated to disclose the base code . . . because he was not required to use the code in his employment."   <u>Id.</u>   However, nothing in paragraph 2.3, or anywhere in the Agreement, says that an employee must be <u>required</u> to use an Invention in order for Apprio to receive rights to that Invention.   Instead, the Agreement states—and Zaccari agreed—that "[i]f, in the course of [his employment], [he] incorporate[s] a Prior Invention into a Company product, process or machine," then Apprio receives intellectual property rights in that Prior Invention.   Agreement ¶ 2.2.   Nor does the third exception—for non-disclosed inventions that do not qualify as Prior Inventions— help Zaccari.   This exception establishes that "Prior Inventions shall not include Inventions that I have developed . . . prior to the commencement of [employment with Apprio]," but with a significant qualification—"if I do not use such inventions in connection with my [employment with Apprio]."   <u>Id.</u>   It therefore does not matter whether some part of the CRR Software was developed before Zaccari worked for Apprio.   Apprio would have rights to the base code if Zaccari "use[d] [it] in connection with [his employment]" and failed to disclose it, or if he "incorporate[d]" it "into a Company product, process or machine."   <u>Id.</u>   Under Paragraph 2.2, then, Apprio has

---

[7] Apprio does not challenge the expert report but argues that Zaccari made admissions in the 1560 litigation, in his responses to requests for admission, and in his copyright filing that are inconsistent with the idea that he created the CRR Software in two stages.   <u>See</u> Reply at 11–12.   The Court need not decide whether this amounts to a genuine dispute of fact because even if Zaccari can prove that the software was developed in two stages, his arguments nonetheless fail for the reasons explained above.

rights in all aspects of the CRR Software if the CRR Software was a "Company product" or if Zaccari developed it by using the base code "in connection with" his employment.  These issues are addressed below, but here it is enough to note that having created the base code in 2008 makes no difference for the purpose of Apprio's rights under Paragraph 2.2.

Zaccari's next argument is that his "updates to the base code . . . fall under the exception provided under Section 2.4 of the Agreement for Unassigned Inventions."  Opp'n at 14.  Citing his own declaration and his expert report, Zaccari argues that the work he did in 2016 amounted only to "non-substantive updates to the base code."  Id. at 14–15 (citing Zaccari Decl. ¶¶ 9–11, Crouse Rept. § V.C–D).  This may be true, but Zaccari points to nothing in the Agreement that exempts "non-substantive updates" to earlier Inventions from the assignment-of-rights provisions. Again, Paragraph 2.2 anticipates the incorporation of Prior Inventions into new Inventions related to Apprio's business and requires that employees sign over their rights in both the new and old aspects of such Inventions.  Agreement ¶ 2.2.  The unambiguous text of the Agreement treats minor or non-substantive updates no differently than major or substantive ones, and Zaccari gives no reason why the Court should construe the Agreement otherwise.

Relatedly, Zaccari contends in a footnote that "the Court must still determine the extent of [Apprio]'s ownership of the copyright for the CRR Software" and that summary judgment is thus precluded on this ground.  Opp'n at 15 n.8.  It is not entirely clear what Zaccari is arguing here, but the argument appears to overlook the partial nature of the summary judgment motion at hand. Apprio moved only "for summary judgment regarding the contractual assignment of any rights Zaccari has in the CRR software, including assignment of all rights Zaccari may have in [his Copyright Registration]."  Mot. at 1.  Apprio has not moved for summary judgment regarding the extent of any proprietary rights, but only regarding its ownership of whatever rights are available.

The Court is only deciding whether Apprio has received from Zaccari "all trade secret, patent, copyright, mask work and other intellectual property rights throughout the world" in the CRR Software. Agreement ¶ 2.1 (defining "Proprietary Rights"). To the extent that Zaccari is arguing, for example, that the work he did in 2016 is somehow not copyrightable, that argument would fall outside the scope of this motion, which concerns only the contractual agreement between the parties.[8] The Court observes, however, that this would be a difficult argument for Zaccari to succeed on because the Agreement is drafted quite broadly in this regard and transfers "all [his] right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes." Id. ¶ 2.3.

Apprio, of course, bears the burden of demonstrating that there is no genuine dispute of material fact. See Celotex, 477 U.S. at 323. Here, it has carried that burden and is entitled to summary judgment on the assignment of rights issue because, for the reasons discussed above, there is no genuine dispute that Zaccari assigned his proprietary rights in the CRR Software to Apprio. In the Agreement, the language of Paragraph 2.3 unambiguously assigns to Apprio all proprietary rights in all Inventions "made or conceived . . . during the period of [the employee's] Service" with Apprio, and Paragraphs 2.2 and 2.4 provide the only relevant exceptions to this assignment, none of which apply to the CRR Software.

There is no genuine dispute that the CRR Software does not qualify as an "Unassigned Invention" under Paragraph 2.4. Unassigned Inventions must be (1) "developed entirely on [an employee's] own time without using the Company's equipment, supplies, facilities, or trade

---

[8] To the extent Zaccari intended to make a different argument, he has waived it by failing to develop it in sufficient detail. "[P]erfunctory and undeveloped arguments" are "deemed waived," and "[t]his is especially true where the only reference to the argument is raised in a footnote." Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela, 146 F. Supp. 3d 112, 126 (D.D.C. 2015) (quoting Johnson v. Panetta, 953 F. Supp. 2d 244, 250 (D.D.C. 2013)); Davis Broad. Inc. v. F.C.C., 63 Fed. App'x 526, 527 (D.C. Cir. 2003) ("[Appellant's] opening brief offers only a perfunctory argument on this issue in a footnote, and we should therefore consider the argument waived.") (per curiam).

secrets"; (2) not "related to the Company's actual or anticipated business, research or development"; and (3) not "result[] from work performed by [the employee] for the Company." Agreement ¶ 2.4. Zaccari does not dispute that "DCMA contracted with Apprio . . . to help it develop better business practices, in particular with respect to its oversight of government contracts and its development of the [Integrated Workload Management System] to efficiently receive and review government contracts," nor does he dispute that "Apprio was tasked with . . . developing, testing, and implementing software . . . to allow for more efficient receipt and review of DCMA's contracts." Resp. SUMF ¶¶ 8, 12. Zaccari also admitted that "one of the functions of the CRR Software is to efficiently implement contract review" and that another is "to automate contract receipt and review processes." Def.'s RFA Resps. Nos. 35, 38; see also Resp. SUMF ¶¶ 34–35 (quoting Def.'s RFA Resps. Nos. 35, 38).[9] He further admitted that he "would not have provided the CRR software to DCMA had he not been employed by Apprio." Def.'s RFA Resps. No. 25. These facts amount to an admission that the CRR Software was, in fact, "related to [Apprio's] actual or anticipated business," and thus that it was not an Unassigned Invention that Zaccari developed separately from his work for Apprio. See Agreement ¶ 2.4.

There is likewise no genuine dispute that the CRR Software is neither a disclosed Prior Invention nor an invention that did not need to be disclosed under Paragraph 2.2. Zaccari has admitted that he did not submit a Previous Inventions Disclosure Form, Def.'s RFA Resps. No. 58, so neither the CRR Software nor the base code can be protected as a Prior Invention. Even if he had disclosed the base code as a Prior Invention, he would have lost his proprietary rights when he incorporated it into the CRR Software. Agreement ¶ 2.2. ("If, in the course of [my Apprio employment], I incorporate a Prior Invention into a Company product . . . , the Company is hereby

---

[9] Zaccari is bound by his responses to Apprio's Rule 36 requests because Zaccari has not filed a motion to withdraw or amend those responses. See Fed. R. Civ. P. 36(b).

granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual worldwide license . . . ."). As the Court has explained, Zaccari cannot establish that his rights in the CRR Software are protected by this paragraph through the third exception of undisclosed earlier inventions. This exception states that Prior Inventions "shall not include Inventions that [employees] have developed . . . prior to the commencement of [Apprio employment]" but only "if [they] do not use such inventions in connection with [their Apprio employment]." Id. For the reasons explained above, there is no dispute that Zaccari did use the CRR Software, including any prior base code, in connection with his work for Apprio. He therefore cannot avail himself of this exception.

In an effort to avoid this conclusion, Zaccari quibbles over the scope of two particular contracts between Apprio and DCMA and argues that he was not involved with one contract and that the other did not include software development. Opp'n at 15–16. The terms of the Agreement, however, are written broadly. It does not matter what work Zaccari was tasked with because the relevant questions are whether the CRR Software "related to the Company's actual or anticipated business," Agreement ¶ 2.4, or whether Zaccari "used [it] in connection with" his Apprio employment, id. ¶ 2.2. Because Zaccari admitted he would not have presented the CRR Software to DCMA had he not worked for Apprio, and because Apprio had a business interest in the contract review process that the CRR Software facilitated, the CRR Software is sufficiently connected to Apprio's business regardless of which contract encompassed Zaccari's work. Finally, Zaccari argues that one Task Order under one contract between DCMA and Apprio was improperly awarded to Apprio, see Opp'n at 16–17, but, even assuming this is true, he does not explain why this would alter the scope of Apprio's "actual or anticipated business" under the terms of the Agreement. Even if Zaccari is correct that this Task Order was improperly awarded, it would not

make the CRR Software unrelated to the other Task Orders and contracts relating to DCMA's contract review process that Apprio properly undertook.

Even accepting all evidence and drawing all inferences in Zaccari's favor—treating the software as a separate base code and subsequent update and assuming that Apprio's contracts with DCMA were awarded in the manner Zaccari suggests—the unambiguous language of the Agreement still dictates that Zaccari assigned his proprietary rights in the CRR Software to Apprio. Zaccari has failed to identify any material facts in dispute that would undermine this conclusion. Hence, Apprio is entitled to summary judgment on the issue of contractual assignment of rights.

## Conclusion

For the foregoing reasons, the Court finds that there is no genuine dispute of material fact that the parties entered into a binding contract and that Zaccari assigned his proprietary rights in the CRR Software to Apprio pursuant to the contract. The Court will grant Apprio's motion for partial summary judgment. A separate order will be issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: June 1, 2021